JUDGE LYNCH

☐ ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       - v. -                 :      **INFORMATION**

ADRIAN DICKER,            :    **09 CRIM 238**

        **Defendant.**        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
(Conspiracy)

The United States Attorney charges:

### Background

1.     From July 1995 through in or about October 2000, ADRIAN DICKER, the defendant, was a United Kingdom chartered accountant and a partner at a major international accounting firm ("the Accounting Firm"), which maintained its headquarters in Chicago, Illinois, and also maintained offices in various other United States cities, including New York, New York. DICKER was a partner in the international tax group in the Accounting Firm's New York office. From in or about early 1999 through October 2000, DICKER was a member of the Accounting Firm's Board of Directors, and thereafter through in or about October 2003, DICKER served on the Board of Directors as a retired partner director. From June 2000 until October 2000, DICKER served as a Vice-Chairman of the

Accounting Firm.

2.　　In or about early 1998, the then-head of the Accounting Firm's national tax practice, who later became the Accounting Firm's Chief Executive Officer ("the CEO"), formed a group devoted to designing, marketing, and implementing high-fee tax strategies for individual clients, often with law firms, investment firms, and financial institutions. Initially called the "Tax Sales Executive Group" and "Tax Products Group," the group's name was changed to the "Tax Solutions Group," or "TSG," in or about October 1999. The strategies marketed by the TSG included tax shelters that could be used by wealthy clients to eliminate, reduce, or defer taxes on significant income or gains. The tax shelters generally generated tax benefits — primarily losses or gain eliminations — that far outweighed the costs to enter into the tax shelters. The Accounting Firm touted the tax shelters internally as "value-added products" whereby fees far in excess of the normal hourly billing rate would be charged.

3.　　From 1998 through October 2000, the CEO led the TSG along with ADRIAN DICKER, the defendant, and another international tax partner from the Accounting Firm's New York, New York office ("Individual A"). After DICKER's retirement in October 2000, until October 2003, the CEO and Individual A led the TSG.

4.　　From 1998 and through October 2000, ADRIAN DICKER, the defendant, was a member of the Accounting Firm's Tax Opinion Committee, a sub-group of

the TSG that included the CEO and Individual A. The Tax Opinion Committee analyzed tax shelter products for their potential use by the Accounting Firm and, ultimately, its clients, and reviewed templates of opinion letters to be utilized in connection with some of those tax shelters.

5.   ADRIAN DICKER, the defendant, and his co-leaders hand-selected the Accounting Firm partners who became members of the TSG. The CEO instructed the TSG members, other Accounting Firm partners, principals, and employees to canvass their respective client bases to determine potential prospects for sales of the tax shelter products — namely, wealthy individuals who had or were anticipating significant taxable gains for the particular tax year. In addition, the Accounting Firm utilized various alliances and relationships with other accounting and financial firms as referral sources for tax shelter product sales. Prospects were referred to TSG members, who would explain or "pitch" various aspects of a particular tax shelter and attempt to convince clients to implement that tax shelter or another.

6.   TSG leadership utilized a bonus structure, administered by DICKER, that handsomely rewarded Accounting Firm personnel involved in the design, marketing, and implementation of the TSG's transactions, including: the individual who referred the client to TSG members; the TSG member who pitched and closed the sale; other TSG members; and TSG management. In addition, the CEO doled out additional bonuses from the profits

earned as a result of the sale of the tax shelter products. Moreover, the Accounting Firm, spearheaded by the CEO, made the sale of the tax shelter products a focal point of the Firm's aggressive "value added" product promotion activities, using a "Tax $ells" logo and other marketing hype, in addition to the TSG sales bonuses, to induce the Accounting Firm's personnel to generate additional tax shelter sales.

7.      In June 2000, ADRIAN DICKER, the defendant, and the other two TSG leaders obtained a compensation agreement from the Accounting Firm, retroactive to July 1, 1999, that paid to them 30% of the net profits of the TSG, which they shared equally. Pursuant to that agreement, DICKER earned more than $6.7 million in profits from the TSG's sale of tax shelters, in additional to his salary and other bonuses, some of which derived from TSG tax shelter sales.

8.      At all times relevant to this Information, Altheimer & Gray ("A&G") was a law firm with its principal office in Chicago, Illinois. From at least 1996 until late December 1998, Lawyer A was a tax partner at A&G and head of its tax practice. On or about December 27, 1998, Lawyer A and two other A&G tax lawyers, Lawyers B and C, left A&G to establish the Chicago, Illinois office of Jenkens & Gilchrist, P.C., ("J&G"), a law firm with offices in Dallas, Texas, and other locations. From in or about early January 1999 until in or about April 1, 2004, Lawyer A served as the managing shareholder of J&G's Chicago office and head of its Chicago tax practice. At all times relevant to this Information,

the tax practice of Lawyers A, B, and C at A&G and J&G (collectively, "J&G") centered around the design, marketing, and implementation of tax shelters, including ones done with the Accounting Firm.

9.     Bank A, a foreign bank with United States headquarters in New York ("Bank A"), among other things, executed the financial transactions used in the Accounting Firm's tax shelters that were designed, marketed, and implemented with J&G, as described below.

## The Short Sale and Short Options Tax Shelters

10.     The first shelter that was designed, marketed, and implemented by the Accounting Firm and J&G, with the assistance of Bank A, was known as the "short sale" transaction, which was typically implemented through three entities set up by J&G with the help of the Accounting Firm — a limited liability company ("LLC"), a partnership, and an S corporation — and typically involved the following steps. Through the LLC, the client would first sell U.S. Treasury securities ("Treasuries") borrowed from Bank A (thereby generating cash proceeds for the client), and subsequently contribute the proceeds to a newly-formed partnership, together with the obligation to close, or "cover," the short position through the purchase of replacement Treasuries. Although the contribution of the cash proceeds –– in an amount that correlated to the tax loss sought by the client — was treated as a partnership asset (thereby increasing the client's tax basis in the partnership), J&G and

the Accounting Firm took the position that the obligation to cover the short sale was not a liability for tax purposes because, notwithstanding the obligation to replace the Treasuries, the precise amount required to do so was not yet fixed or determined. With additional funds deposited into the partnership's account at Bank A, the partnership would purchase either shares of stock or foreign currency. The short sale would then be closed, before year's end and usually after just a few days' duration, and, following liquidation or dissolution of the partnership (typically through transfer of the partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. J&G and the Accounting Firm took the position that the subsequent sale of that stock or foreign currency, executed through Bank A, produced reportable tax losses for the clients. Those losses were roughly equivalent to the basis increase that had been produced through the transaction, and were far in excess of any actual economic loss suffered by the client.

11. A second and similar tax shelter designed, marketed, and implemented by the Accounting Firm and J&G, with the help of Bank A, was known as the "short options strategy," or SOS. The client, through a single member LLC, would purchase a long foreign currency digital option. The premium for the long option equaled the amount of the tax loss the client was seeking to generate. Simultaneously, also through the LLC, the client would enter into (sell) a virtually offsetting short foreign currency digital option. Bank A was the

counterparty with the client on both options contracts. Like the amounts of the options, the cost, or premiums, to purchase those options were closely matched. The only money that the client was required to pay to Bank A was the difference between the long and short premiums ("the net premium"), which typically was one percent (1%) of the tax loss sought by the client.

12.     The client would then contribute the long and short options to a newly-formed partnership, which would result in an increase in the client's tax basis in the partnership equal to the cost of the long option. The Accounting Firm and J&G took the position that the short option would not be treated as a liability for tax purposes, and thus no adjusting decrease in the client's basis in the partnership would occur. As in the short sale tax shelter, the partnership would then purchase foreign currency or shares of stock, or have such assets contributed to the partnership. Thereafter, but before year end, the partnership would close the options positions. The client would then distribute the assets (with the purportedly stepped-up basis) in the partnership to the S Corporation, which would cause a liquidation of the partnership.

13.     Through the S Corporation, the client would sell the stepped-up basis assets (again, stock or foreign currency), thereby generating, according to J&G and the Accounting Firm, ordinary and/or capital losses that were far in excess of any actual economic loss suffered by the client.

## The Tax Fraud

14.     TSG members, including ADRIAN DICKER, the defendant, arranged for the Accounting Firm to market and assist in the design and implementation of the short sale and SOS tax shelters with J&G. The Accounting Firm referred clients to J&G's Chicago office and to Bank A for implementation of those tax shelters. Both J&G and the Accounting Firm portrayed the tax shelters to clients as turnkey products with all-in fees paid to J&G and the Accounting Firm, with additional amounts to be paid to Bank A. J&G created the limited liability companies, partnerships, and S corporations used in the tax shelters. J&G also drafted and sent to the clients the letters of authorization and other documents utilized to execute the preplanned steps of the tax shelters, which steps the TSG members and J&G monitored to ensure timely execution.

15.     The Chicago tax lawyers, ADRIAN DICKER, the defendant, and other TSG members knew that the issuance of a legal opinion letter was necessary for the successful marketing of the tax shelters. J&G prepared a draft template legal opinion for the SOS tax shelter, which DICKER and other TSG members reviewed, providing comments and edits. J&G issued a final legal opinion letter concluding that it was "more likely than not" that the client would prevail in claiming the tax benefits from the tax shelter if challenged by the IRS.

16.     Bank A executed the short sale and options transactions for the tax

shelters. The primary contact for the Accounting Firm/J&G tax shelter clients was an Investment Representative ("Broker A") in the Chicago office of the brokerage arm of Bank A. The Accounting Firm, under the supervision of a Chicago TSG partner, prepared the partnership and S corporation returns, and, for some clients, individual income tax returns, that reflected the tax benefits of the tax shelter transactions. The Accounting Firm refused to sign income tax returns reporting the tax shelter benefits unless and until J&G issued its opinion letter.

17.     The fees charged to the tax shelter clients were based on the amount and character of the tax losses sought by the clients. In particular, J&G generally charged the clients a fee of three per cent (3%) of the desired tax loss for capital losses, and a fee of four per cent (4%) of the desired tax loss for ordinary losses. J&G further agreed to pay the Accounting Firm 20% of the fee J&G received. The Accounting Firm also typically charged the client an additional fee of three to five per cent (3%-5%) of the desired tax loss. The client also was required to pay one per cent (1%) of the desired tax loss as the net premium to Bank A in order to purchase the options used in the short option transaction, and a fee to Bank A based on the amount of Treasuries involved in the short sale.

18.     ADRIAN DICKER, the defendant, first learned of the short sale tax shelter in 1998 as a member of the TSG. Later, during the implementation period of the tax shelters, DICKER knew and understood that, given the costs and fees paid by the clients to

execute the short sale tax shelter, and the nature and duration of the short sale executed at Bank A, those tax shelters had no reasonable possibility of resulting in a profit.

19. With regard to the SOS tax shelters, ADRIAN DICKER, the defendant, and other TSG members knew that the options transactions implemented by Bank A for the clients of the Accounting Firm and J&G had a set pay-out structure — approximately a two-thirds' chance of losing the one per cent net premium paid to Bank A, a one-third's chance of doubling the net premium, and a purported remote or "lottery" chance of earning a larger multiple of the net premium. TSG members and others portrayed this purported lottery chance to the clients as a remote chance of making a significant amount of money. However, DICKER and other TSG members knew that, due to the amount of the fees charged for the SOS tax shelters by the Accounting Firm alone, much less its and J&G's fees combined, any possibility of profit in the SOS transaction necessarily rested on the purported lottery feature. DICKER and other TSG members knew and understood that such a minuscule possibility of profit would not meet the legal requirement that such a transaction have a reasonable possibility of a profit.

20. ADRIAN DICKER, the defendant, and other TSG members knew that the J&G opinion letters utilized a series of false and fraudulent representations to support the legal conclusions therein, including the following: (a) the client entered into the purchase and sale of options for substantial nontax business reasons, including (i) to produce overall

economic profits because of the client's belief that the foreign currency/U.S. Dollar exchange rate relationship would change; and (ii) the client's belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale of the options; (b) the client contributed the options and the shares to his partnership for substantial nontax business reasons, including, but not limited to, potential diversification of the risks of certain investments, the desire to co-invest as partners with the other co-partners and for the client's convenience; and (c) the client's contribution of his interest in his partnership to his S corporation was made for substantial nontax business reasons. In truth and fact, as DICKER and other TSG members then knew, the clients had no substantial nontax business purpose for engaging in the various preplanned steps of the transaction.

21. In light of these false representations and the lack of any reasonable possibility of a profit in the short sale and SOS tax shelters, ADRIAN DICKER, the defendant, and other TSG members knew that J&G's conclusion that the client "more likely than not" would prevail in claiming the tax benefits from the tax shelter if challenged by the IRS was bogus. Nevertheless, DICKER and other TSG members approved the use of the J&G opinion letter notwithstanding the inclusion of the false and misleading representations and the failure of the opinion genuinely to satisfy a "more likely than not" standard. They did so in order to obtain the lucrative compensation and bonuses the Accounting Firm was paying as a result of the sale of the tax shelters. DICKER and other TSG members knew and

understood that the purpose of the J&G opinion letter, as was described to TSG clients by J&G lawyers and TSG members, was to induce clients to purchase the tax shelters and provide a basis for the client to defend against the imposition of penalties should the IRS disallow the deductions in the future. DICKER and other TSG members knew and understood that, in order for the client to assert a claim that no penalties should be imposed, the opinion letter would likely be provided to the IRS.

## Tax Harm Caused By the Fraudulent Tax Shelters

22. Because the short sale and SOS tax shelters were executed simply to generate huge tax losses (and could not result in a profit, when viewed in light of the costs and fees involved), the tax shelters resulted in massive tax evasion caused by J&G and the Accounting Firm on behalf of their clients. The tax shelters that the Accounting Firm implemented with J&G generated over $1,000,000,000 of false and fraudulent tax losses, thus causing the evasion of in excess of $200,000,000 in clients' taxes due and owing to the United States.

## Efforts to Conceal the True Nature of the Tax Shelters

23. As a result of their awareness that the J&G tax shelters lacked reasonable profit potential and business purpose, and therefore were likely to be successfully challenged by the IRS, ADRIAN DICKER, the defendant, and other TSG members developed a template consulting agreement to disguise the fact that the fees clients would be

charged were solely for the tax shelters. The consulting agreement contained a false and fraudulent description of the nature and scope of the services to be rendered under the agreement, and deliberately omitted any mention of the tax shelter. In truth and fact, as DICKER, other TSG members, and J&G lawyers knew, the services to be rendered under the consulting agreement and the fees referenced therein were solely for the implementation of the tax shelter. This was done so that the Accounting Firm and its clients could falsely tell the IRS that the fees were for services in addition to the tax shelter, and therefore only a portion of the Accounting Firm's fees should be counted when conducting a profitability analysis of the tax shelter.

24.    In addition, ADRIAN DICKER, the defendant, knew and understood that other TSG members prepared documentation that falsely portrayed the tax shelters as investment strategies with incidental if any tax benefits. TSG members created, disseminated, and papered their clients' files with documents that falsely and fraudulently ascribed investment motivations of the clients in entering the tax shelter transactions, when in truth and fact, as DICKER and other TSG members knew, the clients' reason for entering into the strategies was to substantially reduce or eliminate their income taxes. DICKER knew and understood that this paperwork was prepared and included in the clients' files with the intention of making it appear to the IRS that the clients' main purpose for entering into the transaction was to make a profit on an investment, whereas, in truth and fact, the primary

if not exclusive purpose was to generate a tax loss. DICKER and other TSG members knew and understood that if the IRS learned about the true nature of the tax shelters, it would disallow the tax benefits generated by the transactions and reported on the tax returns filed by the clients.

## Statutory Allegations

25.     From in or about early 1998 through in or about October 2003, in the Southern District of New York and elsewhere, ADRIAN DICKER, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201, 7206(1), 7206(2), and 7212(a).

26.     It was a part and object of the conspiracy that ADRIAN DICKER, the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would and did defraud the United States and the IRS by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

27.     It was a further part and object of the conspiracy that ADRIAN DICKER, the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would

-14-

and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by various clients of the Accounting Firm, in violation of Title 26, United States Code, Section 7201.

28.     It was a further part and object of the conspiracy that ADRIAN DICKER, the defendant, and his co-conspirators unlawfully, willfully, and knowingly would and did make and subscribe, and cause certain United States clients who participated in the Accounting Firm's tax shelter transactions to make and subscribe, United States individual, corporation, and partnership income tax returns for the years 1998 through 2002, which returns contained and were verified by written declarations that they were made under the penalties of perjury, and which DICKER and his co-conspirators did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

29.     It was a further part and object of the conspiracy that ADRIAN DICKER, the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would and did aid and assist in, procure, counsel and advise the preparation and presentation under, and in connection with matters arising under, the internal revenue laws, of tax returns that were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206(2).

30.     It was a further part and object of the conspiracy that ADRIAN

DICKER, the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would and did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the Internal Revenue Laws, in violation of Title 26, United States Code, Section 7212(a).

## **Means and Methods of the Conspiracy**

31. Among the means and methods by which ADRIAN DICKER, the defendant, and his co-conspirators would and did carry out the objectives of the conspiracy were the following:

a. They would and did design, market, and implement false and fraudulent tax shelters, so that wealthy individuals could pay a percentage of their income in fees to the Accounting Firm, J&G, Bank A, and other participants in the tax shelters, rather than pay a substantially greater amount in taxes to the IRS;

b. They would and did design, market, and implement tax shelters in ways that disguised the fact that the tax shelters were largely or exclusively tax-motivated and lacked substantial nontax business purposes;

c. They would and did prepare and assist in preparing false and fraudulent documents to deceive the IRS about the true nature of the tax shelters, including but not limited to income tax returns, consulting agreements, transactional documents, opinion letters, client file documentation, and correspondence with the IRS;

d.     They would and did make false and misleading statements in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing, and implementation of tax shelters, as well as the motivation behind the clients' participation in the tax shelters.

## Overt Acts

32.     In furtherance of the conspiracy and to effect the illegal objects thereof, ADRIAN DICKER, the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     On or about June 11, 1999, ADRIAN DICKER, the defendant, sent a memo to the then CEO of the Accounting Firm, outlining the roles that he and the other leaders of TSG would have as the "key drivers" of the tax products business line. DICKER further described that "[t]he key element of this business line is to design, market and implement tax products. Adrian Dicker and [Individual A] would organize and drive this crucial part of the business."

b.     In or about late 1999 or early 2000, during a discussion about profit potential in the tax shelter transactions in light of the fees charged by J&G and the Accounting Firm, Individual A discussed with Lawyer A from J&G the disguising of the Accounting Firm's tax shelter fees through the use of a consulting agreement or engagement letter that falsely portrayed the nature and scope of the services to be rendered, and that

deliberately omitted any mention of the tax shelter.

      c.     In or about September 1999, ADRIAN DICKER, the defendant, after speaking to another accountant involved in the design, marketing, and implementation of tax shelters, introduced to and discussed with other TSG members a way to attempt to conceal the reporting of the losses generated by the tax shelters through the netting of gains and losses on a grantor trust tax return, instead of reporting the gains and the losses separately on the clients' individual income tax return.

      d.     In or about September 1999, ADRIAN DICKER, the defendant, along with Michael Kerekes, a co-conspirator not named as a defendant herein and a Los Angeles-based TSG member, met with Client A.D., Client J.S., and representatives of an alliance firm to pitch the Clients on an SOS tax shelter that could eliminate anticipated taxes the Clients expected to pay on their 1999 income.

      e.     On or about October 28, 1999, Michael Kerekes, a co-conspirator not named as a defendant herein, signed and sent a consulting agreement to Client A.D. that falsely and fraudulently described the services to be rendered under the agreement as comprising:

> consulting services in conjunction with ongoing planning for [Client A.D.'s] trust's business interests, including planning for future operations and/or orderly termination and liquidation thereof, assisting [Client A.D.'s] trust and entities it controls in evaluating the various options and their consequences, providing numerical computations . . . to illustrate those consequences, coordinating with [Client A.D. and his trust's] legal counsel, estate planners

-18-

and financial advisors to coordinate the resolution of matters relating to [Client A.D.'s] trust with other business, legal and financial matters, and such other services as [Client A.D.] may request that relate to the above-listed services.

The consulting agreement, which did not mention the tax shelter transaction, provided that Client A.D. would be required to pay the Accounting Firm $133,000 — approximately 2% of the $6.7 million tax loss sought by Client A.D.

 f. On or about November 15, 1999, a Chicago-based TSG member drafted a template letter to be sent to clients and placed in client files in order to provide false and fraudulent business purpose for the Accounting Firm's tax shelters. The letter provided: "Dear [blank,] Just a short note to confirm that I've thought about the business and tax issues we've been discussing and concluded that you should contribute the investments to the partnership. Best regards, [Chicago TSG Member.]"

 g. In or about late 1999, a Detroit-based TSG member asked Broker A about the likelihood of a client receiving a lottery payout in a short options transaction. In response, Broker A stated in substance that if any client came close to hitting the lottery payout, Bank A could prevent that from occurring because Bank A was big enough and controlled both sides of the market.

 h. On or about March 14, 2000, ADRIAN DICKER, the defendant, e-mailed his comments on a J&G draft template SOS opinion letter to a Chicago-based TSG member.

i.      On or about March 22, 2000, J&G sent an invoice for $201,000 to Client A.D. as J&G's fee for the SOS tax shelter. J&G's fee equaled three per cent (3%) of the $6.7 million desired tax loss.

j.      On or about April 10, 2000, J&G sent a false and fraudulent opinion letter to Client A.D. in support of his SOS tax shelter.

k.      On or about April 15, 2000, Client A.D. signed and filed a false and fraudulent 1999 personal income tax return, which reported the losses from Client A.D.'s SOS tax shelter.

l.      On or about June 5, 2000, ADRIAN DICKER, the defendant, and the other two TSG leaders, signed a compensation agreement with the Accounting Firm, retroactive to July 1, 1999, that entitled them to 30% of the net profits of the TSG, which they were to share equally.

m.      On August 9, 2002, TSG member Michael Kerekes, a co-conspirator not named as a defendant herein, made false and misleading statements to the IRS during a deposition relating to the audit of TSG Client B.A.

n.      On December 10, 2002, TSG member Michael Kerekes, a co-conspirator not named as a defendant herein, made false and misleading statements to the IRS during a second deposition relating to the audit of TSG Client B.A.

o.      On or about April 7, 2003, a Chicago-based member of the Accounting

Firm's TSG faxed a letter to an associate attorney at J&G, which copied J&G Lawyer B, identifying tax shelter clients who needed "follow up" tax opinions in 2003 relating to new losses generated by the sale in 2002 of assets with stepped-up basis from tax shelter transactions executed in earlier tax years. Those new losses were being reported by Accounting Firm clients on income tax returns for the 2002 tax year.

p.    On numerous occasions during 1999 and 2000, Broker A from Bank A implemented numerous foreign currency digital option positions for clients of Bank A, the Accounting Firm, and J&G, through Bank A's offices in New York, New York.

q.    In or about 2000, ADRIAN DICKER, the defendant, entered into a tax shelter to offset his income that was substantially similar to the SOS tax shelter executed for TSG clients by the Accounting Firm and J&G.

r.    On his 2000 and 2001 U.S. Individual Income Tax Returns, ADRIAN DICKER, the defendant, at the urging of Individual A, reported tax benefits from the tax shelter described in overt act "q".

s.    On or about October 18, 2003, Accounting Firm Client W.H. filed a 2002 U.S. Individual Income Tax Return that reported false and fraudulent tax losses derived from his SOS tax shelter.

t.    From on or about January 18, 2001, to on or about August 25, 2003, ADRIAN DICKER, the defendant, received approximately $125,000 in compensation for

his service as a retired partner director of the Accounting Firm's Board of Directors.

u.      From on or about December 15, 2000, to on or about March 31, 2003, ADRIAN DICKER, the defendant, received approximately $71,284 in bonuses stemming from TSG tax shelter transactions.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
(Tax Evasion)

The United States Attorney further charges:

33.      The allegations set forth in Paragraphs 1-24, 31, and 32 of this Information are realleged and incorporated by reference as though fully set forth herein.

34.      Among the individuals ADRIAN DICKER, the defendant, participated in pitching a tax shelter product was Client A.D., who, at all times relevant to the Information, resided in the San Diego, California area. Client A.D. was referred to DICKER by an accounting firm that participated in an alliance with the Accounting Firm. Client A.D. was the Chief Financial Officer of a firm of which Client J.S. was the Chief Executive Officer.

35.      In or about September 1999, ADRIAN DICKER, the defendant, along with Michael Kerekes, a co-conspirator not named as a defendant herein,, met with Client A.D.. Client J.S., and representatives of the alliance firm to pitch Clients A.D. and J.S. on an SOS tax shelter to eliminate the taxes they expected to owe for the 1999 tax year, which

for Client A.D. included taxes on income earned from a recent sale of appreciated stock shares to Client J.S. Kerekes outlined the various steps of the tax shelter, including the use of a financial transaction executed through Bank A.

36.     Following Client A.D.'s decision to proceed with the tax shelter transaction, Michael Kerekes, a co-conspirator not named as a defendant herein, caused an engagement letter to be sent to Client A.D. in late October 1999, requiring him to pay the Accounting Firm $133,000, or approximately 2% of the tax loss Client A.D. was seeking, as the Accounting Firm's fee for Client A.D.'s SOS tax shelter. In the letter, Kerekes falsely described the nature and scope of services to be rendered under the engagement letter as services related to "ongoing planning for [Client A.D.'s] trust's business interests," as detailed in paragraph 31.e. above, whereas, as Kerekes well knew, the services to be rendered were solely for the execution of the SOS tax shelter.

37.     Client A.D. set up financial accounts with Bank A through Broker A and, on or about November 16, 1999, Client A.D. executed a $6.7 million SOS transaction through Bank A's foreign exchange trading desk in New York, New York.

38.     In or about November 1999, Michael Kerekes, a co-conspirator not named as a defendant herein, sent Client A.D. a series of false and misleading letters designed to bolster the appearance that Client A.D. had a genuine investment purpose for purchasing the options transaction and a business purpose for entering into the various steps

of the SOS tax shelter, when, Kerekes well knew, Client A.D.'s sole purpose in engaging in the tax shelter was to eliminate taxes due on his 1999 income.

39.     On or about November 19, 1999, Lawyer B sent to Client A.D. certain paperwork relating to the execution of Client A.D.'s short options transaction.

40.     On or about March 22, 2000, J&G sent an invoice in the amount of $201,000 — equaling 3% of the fraudulent tax losses to be generated — to Client A.D. as J&G's fee for the SOS tax shelter.

41.     On or about April 10, 2000, J&G sent Client A.D. a "more likely than not" opinion letter in support of his SOS tax shelter that contained false and fraudulent representations.

## Statutory Allegations

42.     From in or about September 1999 through in or about August 2000, in the Southern District of New York and elsewhere, ADRIAN DICKER, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by Client A.D. to the United States of America for calendar year 1999 by various means, including, among others, aiding and abetting and causing (a) Client A.D. to engage in an SOS tax shelter that DICKER knew had no reasonable possibility of generating a profit; (b) Client A.D. to use the SOS tax shelter to generate approximately $6,700,000 in false and fraudulent tax losses that DICKER knew could not properly be

deducted on Client A.D.'s tax returns; (c) false and fraudulent documents to be created, sent, and placed in Client A.D.'s file that were intended to bolster the appearance of an investment purpose for the SOS tax shelter; and (d) Client A.D. to sign and file a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 1999, which was filed with the IRS on or about April 15, 2000, which substantially understated Client A.D.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201; Title 18, United States Code, Section 2.)

_Lev L. Dassin_

LEV L. DASSIN
Acting United States Attorney

Filed Information & Waiver of
3/17/09 Indictment. Deft. Pres W/Atty Laura
Gavioli, AUSA Stanley Okula & Court reporter
Pres. Deft filed consent to proceed before Mag. Judge.
Deft Pleads Guilty. PSI Ordered. Sentence set
for 12/11/09 @ 2PM before Judge Lynch. Bail set
at $100,000 PRB. Travel restricted to Continental
U.S. Surrender Passport.
                    ∫ Mag. Judge Cott